IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **HIRSCHVOGEL INCORPORATED**, | Case No. 2:17-cv-458 |
| Plaintiff, | Judge Graham |
| v. | Chief Magistrate Judge Deavers |
| **ALLISON TRANSMISSION, INC.**, | |
| Defendant. | |

**OPINION AND ORDER**

This matter is before the Court on Plaintiff Hirschvogel Incorporated's ("Hirschvogel") Motion for Partial Summary Judgment (Pl.'s Mot. Partial Summ. J., ECF No. 35) with respect to its breach of contract claim and Defendant Allison Transmission, Inc.'s ("Allison") Motion for Summary Judgment (Def.'s Mot. Summ. J., ECF No. 36) on Hirschvogel's claims of breach of contract and unjust enrichment. For the reasons that follow, Hirschvogel's Motion for Partial Summary Judgment (ECF No. 35) is **GRANTED** as to liability, and Allison's Motion for Summary Judgment (ECF No. 36) is **GRANTED** in part and **DENIED** in part.

I. **BACKGROUND**

   A. **Factual Background**

This case arises from a contractual dispute between the parties. Hirschvogel, an Ohio corporation, fabricates and produces highly specialized metal parts used in the automotive industry. (Compl. ¶¶ 1, 6, ECF No. 1 at 1–2; ECF No. 35 at 333.) Both parties are merchants as the term is defined in the Uniform Commercial Code ("UCC"). U.C.C. § 2-104(1). For almost twenty years, Hirschvogel supplied Allison, a Delaware corporation with its principal place of business in Indiana, with automotive components for the manufacture of automobile transmissions.

1

(*Id.* at ¶ 2, 7; ECF No. 35 at 333; ECF No. 36 at 373.) During the course of their relationship, the parties operated pursuant to scheduling agreements issued by Allison, which is standard practice in the automotive industry. (ECF No. 36 at 377.) The scheduling agreements outlined the parties' finalized pricing terms and listed a begin date and an end date indicating the applicable pricing time frame. (Def.'s Ex. 3, Purser Dep.65:19-24, 66:3-13, ECF No. 38-37 at 826–27; Def.'s Ex. 4, Rutherford-Driscoll Dep. 98:7-24, 99:1, ECF No. 38-38 at 857–58; Def.'s Ex. 6, Johnston Dep. 10:13-14, 23-24, ECF No. 38-40 at 899.) If the parties agreed to extend the end date of their current scheduling agreement or negotiate new pricing, Allison would issue a form entitled, "Scheduling Agreement Change," reflecting the new end date and pricing. (Def.'s Ex.1.F, ECF No. 38-7; Rutherford-Driscoll Dep. 98: 22-24, 99:1, ECF No. 38-38 at 857–58; ECF No. 45 at 1048)

Prior to the end date of their 2010 Scheduling Agreement, Allison and Hirschvogel attempted to enter into a long-term purchase agreement but failed to reach an agreement on its terms. (Compl., Ex. A, ECF No. 1-1 at 2–3.) By letter dated September 19, 2011 and entitled, 'Termination Agreement Offer: Allison Transmission" (the "2011 Termination Agreement"), Hirschvogel offered to continue supplying parts to Allison based on a fair termination agreement:

> Based on both parties not being able to resolve the terms and conditions for a Long Term Agreement, Hirschvogel is offering to continue to supply of [sic] Allison's parts based on a fair termination agreement stated below:
>
> Both companies (Allison Transmission and Hirschvogel Incorporated) agree to give 12 months advanced notice of termination in writing to the other party. At time of written termination is received, both parties will meet to discuss an exit strategy.
>
> Please sign and return this document stating you accept our offer, and if you have any questions, please contact me at 614-340-5639 or by email at Burke.Gruber@hirschvogel.com.

(Compl., Ex. B, ECF No. 1-2 at 10; Def.'s Ex.1.B, ECF No. 38-3.)

On November 7, 2011, Allison representative, Tanya Beckett, accepted Hirschvogel's offer by signing the 2011 Termination Agreement. (*Id.*)

The parties continued negotiating pricing from 2011 until 2017. (ECF No. 35 at 333; ECF No. 36 at 373.) Once the parties agreed upon pricing for a particular period, a scheduling agreement change was issued with the finalized pricing and time period to which that pricing applied. (ECF No. 36 at 373.) According to then Allison Commodity Manager, Michael Larsen, Allison's negotiations with Hirschvogel were similar to its negotiations with other suppliers. (Pl.'s Ex. B, Larsen Dep. 63:8-19, ECF No. 35-2 at 346.) Allison consistently requested price reductions, while suppliers resisted their attempts. (*Id.* at 58: 16-19, ECF No. 35-2 at 345.)

In 2015, Allison developed concerns about Hirschvogel's seemingly uncompetitive pricing, but Hirschvogel refused to lower its prices and instead raised its pricing on two of the six parts it supplied to Allison. (ECF No. 36 at 373.) At one point during the parties' 2015 negotiations, Hirschvogel urged Allison to commit to pricing, so parts shipments would not be interrupted. (Def.'s Ex. 1.E, ECF No. 38-6 at 666.) To convey that message, then Hirschvogel Account Manager, Rachel Purser, emailed Mr. Larsen stating, "Hirschvogel will need your commitment on 2015 pricing no later than 3/6, so that shipments are not interupted [sic] as discussed." (*Id.*) Allison perceived that message as a threat. (ECF No. 36 at 376.) Hirschvogel counters that its message was merely a negotiation tactic, and that it, in fact, never stopped any shipments to Allison. (Def.'s Ex.5, Dusenberry Dep. 108:4-24, ECF No. 38-39 at 894.)

Allison claims that throughout 2015 and 2016, it informed Hirschvogel that unless Hirschvogel lowered its pricing, Allison would obtain the services of another supplier upon the expiration of the parties' then-current Scheduling Agreement. (ECF No. 36 at 373.) For example, Mr. Larsen emailed then Hirschvogel Account Manager, Krystie Rutherford-Driscoll, in late 2015

stating, "I want to ask 1 more time if Hirschvogel's management understands that by not offering a better LTA that some or possibly all of our current business may move sometime in 2016." (Def.'s Ex. 1.T, ECF No. 38-21 at 734.) Hirschvogel never considered Allison's statements to be serious threats, as Hirschvogel believed the parties' supply relationship would continue as it had in previous years. (Dusenberry Dep. 149:6-13, ECF No. 38-39 at 895.) Hirschvogel claims Allison made similar threats on an annual basis and considered these statements part of Allison's "typical rhetoric" before the parties eventually came to an agreement on price. (*Id.* at 149:22-24.)

Throughout the parties' negotiations, Hirschvogel focused on the possibility of a long-term agreement, something it considered to extend beyond a one-year period. (Dusenberry Dep. 74:17-21.) During the parties' 2015 pricing discussions, Ms. Purser also emailed Allison relaying, "Hirschvogel does not consider a standard scheduling agreement as a[n] LTA." (Def.'s Ex. 1.O, ECF No. 38-16 at 723.) On December 22, 2016, Allison agreed to extend the pricing associated with the parties' then-current Scheduling Agreement through March 31, 2017. (Def's Ex. 1.G, ECF No. 38-9; Def.'s Ex. 1.BB, ECF No. 38-28.) As of January 17, 2017, then Hirschvogel Account Manager, Ms. Rutherford-Driscoll, still believed the parties continued to negotiate a long-term agreement, as evidenced by her email request to Allison for "a 3 year LTA" in return for a cost "improvement." (Def.'s Ex.1.EE, ECF No. 38-30 at 768.)

The following month, Allison verbally informed Ms. Rutherford-Driscoll by phone of its intent to switch suppliers following the March 31, 2017 end date of the then-current Scheduling Agreement. (Compl. ¶ 12, ECF No. 1 at 3; Def.'s Ex.1G, ECF No. 38-8 at 674.) After relaying the news to her supervisor, Eric Dusenberry, Mr. Dusenberry instructed Ms. Rutherford-Driscoll to review the contents of the Allison account binder to determine Allison's contractual obligations upon termination. (Dusenberry Dep. 47:14–24, 48:10, ECF No. 38-39 at 880–81.) Ms. Rutherford-

4

Driscoll emailed Allison representative Mr. Larsen conveying her surprise at his earlier phone call, attaching a copy of the 2011 Termination Agreement, and suggesting a follow up phone call with management to further discuss the situation. (Def.'s Ex.1.CC, ECF No. 38-29 at 766.) Allison refused to rescind its decision. (ECF No. 36 at 387.) Effective April 1, 2017, Hirschvogel ceased supplying Allison with automotive components. (Compl. at ¶ 14, ECF No. 1 at 3.)

### B. Procedural Background

Hirschvogel filed this action on May 26, 2017, setting forth two theories of recovery: (1) breach of contract and (2) unjust enrichment. (Compl. ¶¶ 18–28, ECF No. 1 at 3–4.) Hirschvogel alleges Allison breached the 2011 Termination Agreement by failing to provide twelve months' notice prior to termination. (*Id.* at ¶ 23.) Hirschvogel claims it has been unable to replace the machinery and labor previously scheduled for Allison, resulting in significant factory downtime and a loss of over $1.4 million in profits. (*Id.* at ¶¶ 15–16.) Hirschvogel further claims that it has been unable to find any suitable use for the raw materials purchased for the manufacture of Allison's automotive components, resulting in further losses due to the purchase and storage of the presently unusable raw materials. (*Id.* at ¶ 17.) Hirschvogel also asserts an unjust enrichment claim stating that it relied on Allison's promise to provide twelve months' notice, and in doing so, refrained from seeking alternate customers to which to devote its labor, equipment, and resources and has suffered damages as a result. (*Id.* at ¶¶ 26–28.)

On October 10, 2017, the Court issued an Order (ECF No. 11) staying this action while a parallel action filed by Allison and styled, *Allison Transmission, Inc. v. Hirschvogel, Inc.,* Case No. 1:17-cv-01687-TWP-MJD was pending in the Southern District of Indiana, (the "Indiana Action"). On April 4, 2018, the parties notified the Court that the Southern District of Indiana

5

entered an Entry and Final Judgment on March 21, 2018, dismissing the Indiana Action. (ECF No. 12.) That same day, this Court lifted the stay on the present action.

Throughout this litigation, the parties have viewed their previous business relationship differently. Allison does not dispute the 2011 Termination Agreement's clear and unambiguous language regarding termination, nor does it dispute providing less than twelve months' notice to Hirschvogel, because it perceives no obligation to do so under the parties' supply agreement. (ECF No. 36 at 394, 399.) Allison argues that the Scheduling Agreement Changes governed not only the pricing for the parts Hirschvogel supplied to it, but also the duration of the parties' supply agreement. (ECF No. 45 at 1048–49.) Allison further contends that the 2011 Termination Agreement applies only to situations where one of the parties seeks to terminate the parties' supply agreement, and not where the Scheduling Agreement expired on its own. (*Id.* at 1061–62.) Allison emphasizes its belief of a meaningful distinction between "expiration" and "termination" in the context of the parties' supply relationship. (*Id.*)

Allison maintains that neither party was even aware of the 2011 Termination Agreement from 2014 through February 2017, and therefore the 2011 Termination Agreement cannot govern the parties' relationship, as neither party was relying on its terms. (ECF No. 36 at 374–76.) Allison also argues that Hirschvogel's conduct and communication throughout the course of their pricing negotiations demonstrates a lack of intent to assert the twelve months' advanced written notice provision of the 2011 Termination Agreement, and as such, Hirschvogel has waived its contractual rights by estoppel. (ECF No. 45 at 1064–67.) Specifically, Allison points to Hirschvogel's 2015 statement concerning halting shipments if the parties could not reach a pricing agreement and internal and external Hirschvogel communications concerning Allison's ability to switch suppliers after the end date of a current Scheduling Agreement. (*Id.* at 1065; ECF No. 36 at 376.)

Allison highlights an internal Hirschvogel memo drafted during the parties' 2016 pricing dispute as evidence that Hirschvogel never intended to enforce the twelve-month notice requirement:

> [Allison] repeatedly mentioned that their contract with [Hirschvogel] HVI is ending on 12/31/2015 and they fully intend NOT to renew the contract without having 2016 pricing. Additionally, Robert informed us that Allison Transmissions [sic] have not submitted releases beyond 12/31/2015 and do not intend on doing so until we have provided 2016 pricing. At this point, Allison was informed of the lengthy steel lead times and by not providing release information beyond 12/31/2015 they put themselves at risk of not having enough material to support their requirements. Their response was that they fully understand the consequences and are prepared.

(Def.'s Ex. 1.R, ECF No. 38-19 at 731)

Allison also focuses on an email sent by Hirschvogel Account Manager, Ms. Rutherford-Driscoll, to then Allison Commodity Manager, Mr. Larsen, and Global Purchasing Manager, Robert Johnston, stating:

> One key item I want to touch on. In the meeting Robert adamantly expressed Allison Transmissions [sic] contract with Hirschvogel Automotive ends on 12/31/2015 and that Hirschvogel will not receive any releases or forecast information beyond that date. At that point, Allison was informed of the lengthy steel lead times and by not providing release information beyond 12/31/2015, they put themselves at risk of not having enough material to support their requirements. Roberts [sic] response was that he fully understands the consequences of not ordering parts can potentially shut off their supply and is prepared for that possibility.

(Def.'s Ex. 1.T, ECF No. 38-21 at 738–39.)

That same day, Mr. Johnston responded to Ms. Rutherford-Driscoll's email:

> Just so we are clear I never quite said what you have attributed to me. My comment was that until I have Hirschvogel's 2016 pricing I am not able to show you production schedules into 2016 as our current pricing ends on 12/31/15. Yes this is a problem and I am anxious awaiting to hear from you. Please provide me something that we can work with immediately.

(*Id.* at 737.)

Hirschvogel maintains that knowledge of the 2011 Termination Agreement prior to Allison's February 2017 notice is irrelevant. (ECF No. 46 at 1099.) Hirschvogel points to Mr.

7

Dusenberry's deposition testimony as evidence that the occasion to review the 2011 Termination Agreement never arose until Allison notified Hirschovogel that it was ending the parties' supply relationship. (ECF No. 46 at 1100 citing Dusenberry Dep. at 48:3-11). Hirschvogel further avers that a signatory to a contract is bound to its terms whether it remembers those terms or not. (*Id.* at 1100.)

## II. STANDARD OF REVIEW

Both parties have moved for summary judgment under Federal Rule of Civil Procedure 56. Under Rule 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt,* 586 F.3d 459, 465 (6th Cir. 2009). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

The movant's burden is to demonstrate "the absence of a genuine issue of material fact as to at least one essential element on each of the [non-movant's] claims." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 322). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Conversely, material facts in genuine dispute that "may reasonably be resolved in favor of either party" require denial of summary judgment in order to be properly resolved by a jury. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). When ruling on a motion for summary judgment, a court must assume as true the evidence of the non-

moving party and draw all reasonable inferences in that party's favor. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A court must avoid "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," which are "jury functions" that are inappropriate to employ at the summary judgment stage. *Id.*

There is no obligation to "grant judgment as a matter of law for one side or the other," simply because the parties have filed simultaneous cross-motions for summary judgment. *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 312 (6th Cir. 2010) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). Instead, "a 'court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* (quoting *Taft*, 929 F.2d at 248). Each motion must be evaluated under the standard requiring the Court to "view all facts and inferences in the light most favorable to the non-moving party." *Travelers Prop Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010) (quoting *Beck v. City of Cleveland, Ohio*, 390 F.3d 912, 917 (6th Cir. 2004)).

### III. DISCUSSION

#### A. Choice of Law

As an initial matter, the Court addresses the parties' disagreement concerning choice of law. Hirschvogel brings its claims against Allison based on diversity and asserts Ohio law governs this matter, whereas Allison asserts Indiana law governs. (ECF No. 36 at 387 n.7.) Where a case warrants a choice of law determination, a federal court sitting in diversity applies the choice of law provisions of the forum state. *Pedicini v. Life Ins. Co. of Alabama,* 682 F.3d 522, 526 (6th Cir. 2012). But the Court finds it unnecessary to do so here, because under Ohio law, "'if two jurisdictions apply the same law, or would reach the same result applying their respective laws, a

choice of law determination is unnecessary because there is no conflict, and the laws of the forum state apply.'" *Mulch Mfg. Inc. v. Advanced Polymer Sols., LLC*, 947 F. Supp. 2d 841, 855 (S.D. Ohio 2013) (quoting *Wendy's Intern., Inc. v. Illinois Union Insur. Co.*, No. 2:05-cv-803, 2007 U.S. Dist. LEXIS 15699, 2007 WL 710242, at *15 (S.D. Ohio Mar. 6, 2007)).

Furthermore, "[t]he party seeking to apply the foreign law bears the burden of showing that the foreign law is different from the local law." *Id.* Here, Allison, seeking to apply Indiana law has the burden of showing that Indiana law is different from Ohio law. Not only has Allison failed to discuss any material differences between Ohio and Indiana law on either of Hirschvogel's claims, but as Allison notes, "Ohio law and Indiana law utilize the same elements for breach of contract and unjust enrichment and have adopted/follow the same relevant UCC provisions." (ECF No. 36 at 387 n.7.) Therefore, the Court finds no need to conduct a choice of law analysis and will apply Ohio law to the issues in this case.

### B. Breach of Contract

Under Ohio law, "the elements for a breach of contract are that a plaintiff must demonstrate by a preponderance of the evidence that (1) a contract existed, (2) the plaintiff fulfilled his obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted from this failure." *Anzalaco v. Graber,* 2012 Ohio 2057, 970 N.E.2d 1143, 1148 (Ohio Ct. App. 2012). "[T]he interpretation of written contract terms . . . is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008). Allison argues that the undisputed facts demonstrate that summary judgment is appropriate on Hirschvogel's breach of contract claim, because the 2011 Termination Agreement is not an enforceable contract under the UCC. (ECF No. 36 at 388.) Specifically, Allison insists that the 2011 Termination Agreement lacks any agreement as to price and quantity, as required by the UCC for a contract for the sale of

goods. (*Id.*) Hirschvogel counters that the 2011 Termination Agreement is not a contract for the sale of goods. (ECF No. 41 at 940.)

i. **Whether the 2011 Termination Agreement is Governed by the UCC**

Ohio Revised Code Chapter 1302, the statutory codification of Article Two of the Uniform Commercial Code, applies to transactions involving the sale of goods. Ohio Rev. Code § 1302.02. Ohio courts considering the applicability of the UCC to a given contract use the predominant purpose test. "R.C. 1302 applies if 'the predominant factor and purpose of the contract is the sale of goods.'" *Airborn Elecs., Inc. v. Magnum Energy Sols., LLC,* 2017-Ohio-70, 82 N.E.3d 504 (Ct. App.) (quoting *Renaissance Techs., Inc. v. Speaker Components, Inc.*, 2003-Ohio-98 ¶ 5 (Ct. App.). Federal courts applying Ohio law have likewise adopted the predominant purpose test. *See, e.g., Mecanique C.N.C., Inc. v. Durr Envtl., Inc.,* 304 F. Supp. 2d 971 (S.D. Ohio 2004); *Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 665 F. Supp. 2d 899 (S.D. Ohio 2009).

Under the predominant purpose test, the issue is "whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods, with labor incidentally involved." *Allied Indus. Serv. Corp. v. Kasle Iron & Metals, Inc.*, 62 Ohio App. 2d 144, 147, 405 N.E.2d 307, 310 (1977). The burden of proof lies with the party asserting that the contract is governed by the UCC. *Executone,* 665 F. Supp. 2d at 907. Here, Allison must prove that there is no genuine dispute of material fact concerning whether the 2011 Termination Agreement is governed by the UCC.

Generally, whether the contract involves "predominantly services or predominantly goods is a question of fact, and the controlling factor is the intention of the parties, as derived from the contract." *Urban Indus. of Ohio, Inc. v. Tectum, Inc.*, 81 Ohio App. 3d 768, 774, 612 N.E.2d 382, 383 (1992). But this Court has previously determined that, it is possible to resolve such a dispute

11

by summary judgment, because Ohio law provides that, "'[w]here . . . there are no disputed facts that raise issues to be decided by the jury, it is proper for the trial court to rule as a matter of law on whether the contract is covered by Article Two [of the UCC].'" *Franklin Publ'ns, Inc. v. Gen. Nutrition Corp.*, No. 2:05-cv-1061, 2007 U.S. Dist. LEXIS 50946, at *10 (S.D. Ohio July 13, 2007) (quoting *Arlington Elec. Constr. v. Schindler Elevator Corp.*, No. L-91-102, 1992 Ohio App. LEXIS 953, 1992 WL 43112 at *4 (Ohio App. 6th Dist. Mar. 6, 1992)).

Allison argues that the relationship between the parties was solely for the sale of goods and never included a service component. (ECF No. 45 at 1058.) Allison highlights the following language in the 2011 Termination Agreement as indicative of that point, "Hirschvogel is offering to continue to supply of [sic] Allison's parts." (ECF No. 38-3.) Allison further contends that an abundance of case law proves that automotive supply contracts are contracts for the sale of goods. (ECF No. 45 at 1058) (citing *e.g., Johnson Controls, Inc. v. Jay Indus., Inc.,* 459 F.3d 717, 723 (6th Cir. 2006)). Therefore, Allison urges the Court to take the position that the predominant purpose of the agreement was for the sale of goods. The Court is not persuaded.

In support of its contention that the 2011 Termination Agreement was not a contract for the sale of goods, Hirschvogel cites an Eighth Circuit case, *United Indus. Syndicate, Inc. v. W. Auto Supply Co.*, 686 F.2d 1312 (8th Cir. 1982), where the court analyzed whether a notice agreement between the parties was essentially an agreement for the sale of goods not yet manufactured. *Id.* at 1314. The Eighth Circuit examined the history and character of the business relationship between the parties and recognized that, "the dominant purpose of a particular agreement may be independent of such sales," and "outside the UCC." *Id.* at 1315. The court also found that given the length of the parties' relationship, the contract at issue was not a "single-shot buy-sell agreement." *Id.* Moreover, the notice agreement at issue was deemed to "transcend[] the

12

mere sale of goods and reflect[ed] a bargained-for exchange of mutual benefits and detriments that are independent of particular sales transactions." *Id.* at 1315–16. It was these mutual exchanges not to terminate without the agreed upon six months' notice that constituted the dominant purpose of the agreement, and the Eighth Circuit found that this purpose was independent of the sales which took place between the parties. *Id.* at 1316.

The Court notes similar circumstances in the parties' relationship in the instant case. Here, the parties had been doing business with one another for over a decade when they entered into the 2011 Termination Agreement. Upon entering the agreement, Allison gained a guaranteed supply of automotive components for its manufacture of automobile transmissions. In turn, it gave up the right to replace Hirschvogel as the supplier of these parts. Likewise, Hirschvogel gained an assured parts recipient. In turn, it was obligated to meet Allison's supply demands. Here too, mutual benefits were conferred with the security accompanying a significant lead time prior to the termination of the parties' relationship. Both parties have acknowledged the substantial time needed to establish a supply relationship on either end, given the significant time required to resource parts and familiarize a new supplier with the process. (Larsen Dep. 72:2-13, 74:12-14, ECF No. 35-2 at 347; Dusenberry Dep. 71:14-16, ECF No. 41-1 at 959.) The parties' recognition of the significant lead time required is evinced by their pledge to provide twelve months' notice followed by an agreed exit strategy.

The parties do not dispute the clear and unambiguous language of the 2011 Termination Agreement. Though neither of the signatories to the agreement was still employed by either company on the date Allison ended the parties' relationship, it is clear that in 2011, the parties intended twelve months' advanced written notice prior to the termination of their supply relationship to discuss an exit strategy. Furthermore, the 2011 Termination Agreement contains

none of the provisions courts associate with UCC-governed contracts, such as: warranty; inspection and return of products; payment for products; payment of taxes on products; acceptance and rejection of purchase orders; shipment of products; title to product and risk of loss; liens for payment; and patents and trademarks for products. *Executone*, 665 F. Supp. 2d at 908. The parties' mutual exchanges not to terminate without the agreed upon twelve months' advanced written notice constitutes the dominant purpose of the 2011 Termination Agreement, and this Court finds that this purpose was independent of the scheduling agreements. As such, Allison has not sustained its burden of proof as the party asserting that the 2011 Termination Agreement is covered by the UCC, and the Court finds as a matter of law that the 2011 Termination Agreement is not covered by the UCC.

### ii. Expiration Versus Termination

Allison further contends that the undisputed facts show that the 2011 Termination Agreement only applies to situations where either party seeks to terminate the parties' supply relationship and not upon the expiration of a scheduling agreement. (ECF No. 36 at 394.) Allison relies heavily on *Avis Rent A Car Sys., LLC v. City of Dayton*, No. 3:12-cv-399, 2013 U.S. Dist. LEXIS 104545 (S.D. Ohio July 24, 2013), *aff'd*, *Avis Rent-A-Car Sys. v. City of Dayton*, 581 F. App'x 479, 483 (6th Cir. 2014) where this Court and the Sixth Circuit distinguished between "termination" and "expiration" as constituting two different events in a case involving breach of a lease agreement. But the Court does not find these cases instructive as to the instant case, because in the *Avis* cases, the lease agreement at issue contained both the words "expire" and "terminate," and this Court had to determine the specific purpose for the use of each. *Avis Rent A Car Sys., LLC v. City of Dayton*, No. 3:12-cv-399, 2013 U.S. Dist. LEXIS 104545 at *14. Whereas in this case, the 2011 Termination Agreement never uses the word "expire" or the word "expiration." Neither

14

does the Scheduling Agreement, nor is the Scheduling Agreement incorporated by reference into the 2011 Termination Agreement. All references to an expiration of the parties' supply relationship are put forth by Allison, but they are never memorialized in a signed agreement. Thus, the task presently before the Court is to determine the intent of the 2011 Termination Agreement with regard to the parties' overall supply relationship and any relation to the parties' Scheduling Agreement.

Hirschovogel argues that the plain language of the 2011 Termination Agreement clearly indicates that the parties intended that agreement to govern their overall supply relationship, irrespective of any scheduling agreement, which simply denoted the end of a particular pricing time frame. (ECF No. 41 at 945–46.) "Common words in a contract are given their plain and ordinary meaning, unless another meaning is clearly evident from the face or overall content of the contract, or unless the result is manifestly absurd." *Hope Acad. Broadway Campus v. White Hat Mgmt., L.L.C.*, 145 Ohio St. 3d 29, 39, 46 N.E.3d 665, 674–75 (2015). Hirschvogel draws the Court's attention to the following language in the 2011 Termination Agreement as evidence of the parties' intent to apply the terms of the 2011 Termination Agreement to their overall relationship: "Based on both parties not being able to resolve the terms and conditions for a Long Term Agreement, Hirschvogel is offering to continue to supply of Allison's parts based on a fair termination agreement." (*Id.* at 946.)

Hirschvogel maintains that adopting Allison's proffered reasoning would render the 2011 Termination Agreement meaningless, resulting in manifest absurdity. (*Id.*) Hirschvogel argues that if the parties were free to end their relationship at the end of a scheduling agreement, then the 2011 Termination Agreement would have no effect, as there would never be a reason to provide

15

notice of termination at the beginning of a twelve-month period if the parties' supply relationship would expire regardless after twelve months. (*Id.*)

> In the construction of a contract courts should give effect, if possible, to every provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain.
>
> *Foster Wheeler Enviresponse v. Franklin Cnty. Convention Facilities Auth.*, 1997-Ohio-202, 78 Ohio St. 3d 353, 362, 678 N.E.2d 519, 526 (internal quotation marks omitted).

In applying this rule to the instant case, the Court finds Allison's interpretation of the contract to be meaningless, whereas giving effect to Hirschvogel's interpretation of the 2011 Termination Agreement provides meaning and purpose to the parties' agreement. Therefore, the Court finds Allison's expiration argument to be unavailing.

### iii. Whether the 2011 Termination Agreement is a Valid, Enforceable Contract

The Court considered at oral argument the issue of whether the 2011 Termination Agreement is enforceable due to the lack of a material term. Upon further examination of the agreement, the Court notes that while the agreement itself does not contain a pricing term for the interim period prior to termination, the agreement required the parties to provide twelve months advanced written notice of their intention to terminate their long-standing relationship and to formulate a reasonable exit strategy for the termination of that relationship. (ECF No. 38-3.) The agreement has all of the material terms necessary for the enforcement of such an agreement, and the Court therefore finds, as a matter of law, that the 2011 Termination Agreement is a valid, enforceable contract.

### C. Waiver by Estoppel

Allison alleges that Hirschvogel waived its right to enforce the 2011 Termination Agreement through "their repeated actions (including the 2015 stop ship threat) and communications recognizing Allison's right to switch suppliers upon the expiration of the then current End Date without requiring twelve months' notice." (ECF No. 36 at 398.) "[U]nder the theory of waiver by estoppel, [defendant] need only show that [plaintiff's] *conduct* was inconsistent with an intent to enforce its rights." *Nat'l City Bank v. Rini,* 2005-Ohio-4041, ¶ 26, 162 Ohio App. 3d 662, 668, 834 N.E.2d 836, 840. Waiver by estoppel "'exists when the acts and conduct of a party are inconsistent with an intent to claim a right, and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it.'" *Id.* at 834 N.E.2d at ¶ 24.

Allison relies on *Constr. Sys. v. Garlikov & Assocs.*, 2012-Ohio-2947 (Ct. App.), where a commercial tenant entered into a construction project contract allowing the tenant to withhold payment to subcontractors until the project was completed. Because the tenant engaged in the affirmative conduct of submitting invoices for payment throughout the project but later attempted to withhold payment to the subcontractors, the court found that the tenant's previous conduct of submitting invoices was inconsistent with its intent to later claim its right to withhold payment. *Id.* at ¶ 47. Allison argues Hirschvogel's conduct is akin to the tenant's in the aforementioned case. Specifically, it points to a February 26, 2015 email from Hirschvogel Account Manager Ms. Purser stating:

> Hirschvogel is requiring written acceptance of the 2015 material increase no later than Friday 3/6/2015. Shipments of 50088 and 50089 will be halted after this date until we receive your commitment on pricing. Please understand we have been paying the increased price, to the mill, on the parts you have already been receiving.
> (Ex. 1.M).

17

Allison maintains that such conduct is inconsistent with any belief that either side was required to provide twelve months' notice before ending the parties' supply relationship. (ECF No. 36 at 399.) According to Allison, because the parties shared a similar belief regarding notice, Allison acquiesced and accepted Hirschvogel's price increase. (*Id.*)

Despite Allison's insistence, the Court finds that Hirschvogel's conduct is not akin to the commercial tenant's in *Constr. Sys. v. Garlikov & Assocs.* Viewing the evidence in the light most favorable to Hirschvogel, Allison has failed to submit evidence of any misleading conduct by Hirschvogel that resulted in any prejudice to Allison. The Court finds that not only was Hirschvogel not required to dispute Allison's threat to terminate at the end of a given scheduling agreement, but any discussion of Hirschvogel potentially stopping shipments was a bargaining tactic, and as such, its conduct does not amount to waiver by estoppel. Furthermore, Allison did not change its position to its detriment based on this conduct. Therefore, the Court cannot determine that Hirschvogel's conduct constituted a waiver of its rights under the 2011 Termination Agreement, and it does not bar summary judgment.

### D. Unjust Enrichment

Allison notes in its reply brief that Hirschvogel has failed to respond to Allison's Motion for Summary Judgment as it pertains to Hirschvogel's unjust enrichment claim and submits that Hirschvogel therefore concedes that its unjust enrichment claim fails as a matter of law. (ECF No. 45 at 1046 n.2.) Upon reading Hirschvogel's response in opposition (ECF No. 41), the Court notes Hirschvogel's failure to respond to Allison's arguments concerning its unjust enrichment claim.

The Sixth Circuit's position on a plaintiff's abandonment of a claim is well established. "[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.,* 545 F. App'x 368, 372 (6th

Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim)). As Hirschvogel never addresses Allison's arguments concerning its unjust enrichment claim in response to Allison's motion for summary judgment, Hirschvogel is deemed to have abandoned that claim. Consequently, Allison is entitled to judgment as a matter of law on Hirschvogel's unjust enrichment claim.

## IV. CONCLUSION

Based on the foregoing, Hirschvogel's Motion for Partial Summary Judgment (ECF No. 35) is **GRANTED** as to liability, but the issue of damages remains for trial. Allison's Motion for Summary Judgment (ECF No. 36) is **GRANTED** in part as it relates to Hirschvogel's unjust enrichment claim and **DENIED** in part as it relates to Hirschvogel's breach of contract claim. Accordingly, Hirschvogel's unjust enrichment claim is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED**.

/s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: May 10, 2019